IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEMETRIUS COOPER,

              Plaintiff,

    v.

KAYLENE BETANCOURT, ERIC NERISON,
LUCINDA BUCHANAN, AND BONNIE ALT,

              Defendants.

OPINION AND ORDER

21-cv-727-slc

---

Pro se plaintiff Demetrius Cooper, currently incarcerated at Waupun Correctional Institution, is proceeding on claims under the First, Eighth, and Fourteenth Amendments against various employees at the Columbia Correctional Institution related to a tube feeding that occurred on April 13, 2021. Several motions are now before the court: (1) defendants' motion for summary judgment as to Cooper's claims, dkt. 51; (2) Cooper's motion for sanctions, dkt. 64; and (3) Cooper's trial-related motion in limine and motion for subpoenas, dkts. 91, 93, and 95.

For the reasons below, I am granting defendants' motion for summary judgment with respect to all of Cooper's claims and entering judgment in favor of defendants. I am denying Cooper's motion for sanctions, both because Cooper failed to comply with the safe harbor requirement in Federal Rule of Civil Procedure 11(c) and because the motion is unfounded. Finally, I am denying Cooper's trial-related motions as moot.

I find the following facts to be undisputed and material:

UNDISPUTED FACTS

## I.  The Parties

Plaintiff Demetrius Cooper is an inmate who was housed at the Columbia Correctional Institution (CCI) from March 15, 2021 to June 21, 2021.  Defendants all worked at Columbia during the time relevant to this case: Eric Nerison as a lieutenant (supervisor), Kaylene Betancourt as a correctional sergeant, Lucinda Buchanan as the Health Services Manager (HSM) in the Health Services Unit (HSU), and Bonnie Alt as a nurse.

## II.  Cooper's Hunger Strike and Tube Feeding Order

Prior to arriving at CCI, Cooper began a hunger strike protest during his incarceration at the Wisconsin Secure Program Facility (WSPF).  That facility obtained a court order to forcibly tube feed Cooper.  Dr. Juston Ribault submitted a medical affidavit in February 2020 in support of the court order.  *See* dkt. 66-1 at 9-10.  In a March 2, 2021 progress note, Dr. Ribault stated that Cooper "is receiving involuntary feedings" and "food continues to be offered to him that he can eat voluntarily."  *Id.* at 80.

Tube feeding involves a flexible, small diameter hose being inserted through the nose, and a liquid solution running through the hose into the individual's stomach.  Department of Adult Institutions (DAI) Policy 300.00.57 sets forth procedures and responsibilities for hunger strikes. Section II defines three classifications of hunger strikes:  emergent (refusing fluids for 24 hours and/or food for 72 hours or actively being forced treatments through a court order); non-urgent (intermittent refusal of food or fluids requiring monitoring); and resolved (sufficient caloric and fluid intake over acceptable time frame).  Under § VII.A.2, an advanced care provider (ACP)

2

must physically examine an inmate on an "emergent hunger strike" at least every 72 hours, and a registered nurse (RN) must "collect assessment data and consult with the on-call Physician if the 72 hours interval falls on an ACP non-work day." Dkt. 66-1 at 25. Because WSPF did not have a doctor or ACP onsite to monitor Cooper's hunger strike on a long-term basis, Cooper was transferred to Columbia.

### III. Cooper's Hunger Strike at Columbia

Upon his arrival at Columbia on March 15, 2021, Cooper was placed in segregation to serve out time imposed for an incident unrelated to his hunger strike. The court order for tube feeding remained in place.

Section IX of DAI Policy 300.00.57 provides that court orders for tube feeding are only obtainable through an ACP/physician, not an advanced practice nurse practitioner or physician's assistant. *See id.*, § IX.D.2. "If a court order for forced feeding is obtained, nasogastric tube feeding placement shall be followed as detailed in the Lippincott Manual." *Id.*, § IV.F. And "[o]nce a Court Order has been obtained, the patient's medical condition shall be monitored at least daily and the classification will remain emergent until the forced interventions are discontinued. *Id.*, § IX.D.3. A physician must order the amount and frequency of tube feeding interventions. *Id.*, § IX.D.4.

Cooper's medical record shows that there was an active patient care order for tube feeding in place at Columbia between April 8 and May 5, 2021, providing for "3 packets of boost via NGT twice daily." Dkt. 56-1 at 5. However, Cooper was not tube fed at Columbia until April 13, 2021.

3

Cooper says that he had met with Buchanan upon his arrival at Columbia and agreed to eat and drink on his own without tube feedings.  Notes from the Mental Health Multi-Disciplinary Team (referred to as the "M-team")[1] show that Cooper ate and drank Boost on March 24 and April 7, 2021, but the notes from March 24 and April 14, 2021 state that he was eating only off and on.  *See* dkt. 66-1, at 32-33.  There are no M-team notes concerning Cooper's eating or drinking from April 8 to 12, 2021, *id.*, but a form entitled "Nutritional Monitor" shows that Cooper drank Boost and water at the HSU on April 9, 10, and 11, *see id.* at 50.  Progress notes confirm that Cooper drank three Boosts and three cups of Gatorade on April 9 at 10:53 p.m., April 10 at 6:07 a.m., and April 11 at 6:22 a.m.  *Id*. at 40-41.  However, he only drank one Boost on April 11 at 5:46 p.m. and April 12 at 5:18 a.m.  *Id.* at 40.  In addition, although defendants Buchanan and Alt admit knowing that a meal monitor noted that Cooper drank Boost on April 11, 2021, and that Cooper took a noon meal and evening snack bag on April 12, 2021, both providers state that they did not know whether Cooper actually ate the food that he was given.  *See* dkt. 66-1, at 84, 89 (defendants' responses to Cooper's request for admissions).

Advanced care providers (ACPs) such as physicians and nurse practitioners are responsible for final treatment decisions and care plans and writing prescriptions.  Buchanan and Alt defer to medical decisions made by ACPs.  In addition, Alt does not have the authority to override the decision of her immediate supervisor, Buchanan.

---

[1]  M-team notes are emailed to all nursing staff, including defendant Alt.

**A.  Cooper Meets with Security Director and a Lieutenant on April 8, 2021**

Cooper met with Security Director Ryan Blount and Lieutenant Olson on April 8, 2021. At this meeting, Cooper was told that the warden would grant him an early release from segregation if Cooper agreed to continue to eat and drink on his own and willingly walk to the HSU to drink Boost and electrolytes.  Cooper says that he agreed to these terms and began walking to the HSU on April 12, 2021, to drink Boost.[2]

**B.  Cooper Sees Alt on April 12, 2021**

Alt worked from 6:00 p.m. on April 11, 2021 to 7:30 a.m. on April 12.  During that shift, she saw Cooper.  A progress note electronically signed by Alt at 5:28 a.m. on April 12, 2021, states that Cooper did not have "an official appointment listed in the [electronic medical records (EMR)] but considering the circumstances and his agreement with the Security Director, it would make sense that he would be seen today, I'm just not aware of an exact time." Dkt. 66-1 at 40.  Alt also wrote that Cooper "would only take the 1 Boost and 3 cups of Gatorade as he repeated again he was told that was all he had to drink."  *Id.*

**C.  Kramer's April 12, 2021 Hunger Strike Assessment of Cooper**

Cooper had an appointment with Nurse Practitioner Jeannie Kramer on April 12, 2021, during which Cooper says that he agreed to eat his nightly snack bag and drink Boost in the

---

[2] Contrary to Cooper's contention, defendants' admissions do not show that any of the defendants had actual knowledge of his agreement with Blount and Olson.  Nerison's and Betancourt's admissions state only that Cooper stated that he had such an agreement when they went to extract Cooper from his cell on April 13, 2021.  *See* dkt. 66-1, at 94, 98.  Alt's admissions deal only with what the food monitor noted about Cooper taking food trays or Boost.  *Id.*, at 89.

HSU after the 6:15 a.m. count.  The parties dispute whether defendant Buchanan was present at the appointment and the outcome of that appointment.[3]

The progress notes entered by Kramer at 1:41 p.m. state that Cooper met with Kramer for a hunger strike assessment and that Cooper raised concerns about the amount of soy and sodium in certain diets.  *See* dkt. 56-1 at 3-4.  Kramer noted that it was unclear how much food Cooper was actually taking, and there were conflicting reports as to whether he was eating his evening snack.  However, because Cooper had been drinking his Boost/Pedialyte over the weekend, Kramer classified his hunger strike as "intermittent."  *Id.* at 4.  At the end of the visit, Cooper was "amicable" to continuing food intake by mouth, but when an officer told Cooper that soy was "in everything," Cooper declared that he was "back on" his hunger strike.  *Id.* Kramer wrote that HSU would follow up later in the week, Cooper would be offered meal trays and fluids on a regular basis, and his food intake and medication would be monitored.  There was no reference in Kramer's note about Cooper not needing to be tube fed or the tube feeding order being discontinued.

## II.  Security Escort to HSU on April 13, 2021

### A.  Officers Report to Cooper's Cell

On April 13, 2021, at approximately 5:00 a.m., defendants Nerison and Betancourt, along with Sergeants Phipps and Nguyen (non-defendants), reported to Housing Unit 9 to

---

[3] Buchanan was working between 7:11 a.m. and 5:15 p.m. on April 12, 2021.  She avers that she did not discuss Cooper's plan of care or tube feedings with Kramer on that date.  She also generally states in her response to Cooper's interrogatories that she does not remember who was at the meeting on April 12, 2021.  *See* Dkt. 66-1 at 86.  Cooper says Buchanan was at the meeting. And as discussed in section IV of the court's factual findings, Kramer wrote in a May 4, 2021 email to higher-ups that "[m]y directions to nursing the previous evening [April 12] were that he could choose to drink the boost voluntarily and if not, then tube feed."  Dkt. 66-1 at 61.

escort Cooper from his cell to HSU for a tube feeding.  Cooper told the officers that a nurse practitioner had agreed the day before that he did not need further tube feedings.  Apart from what Cooper told him, Nerison was not aware of any agreement that Cooper had with Security Director Blount or Nurse Practitioner Kramer regarding Cooper's court-ordered tube feedings.  But because Cooper was so insistent that he did not need the tube feeding, Nerison left the housing unit to call HSU to confirm whether the tube feeding needed to be done.

### B.  Nerison Calls Alt

Shortly after 5:00 a.m. on April 13, 2021, Nerison called defendant Alt about Cooper's claims that he was not supposed to be tube fed.  Alt had begun her shift at 10:00 p.m. on April 12, 2021, and was scheduled to work until 7:00 a.m. on April 13.  Alt checked Cooper's HSU records and found that an order was still in effect for a nasogastric (NG) tube and three packets of boost via NG tube twice daily.  Alt also saw the April 12, 2021 progress note entered by Kramer about her assessment of Cooper.[4]  Alt then called defendant Buchanan at home and reported that Cooper was refusing to go to HSU for his court-ordered tube feeding and claiming that he no longer needed to do so.  Alt asked Buchanan if she had any knowledge of an agreement where Cooper no longer needed his tube feeding.  Buchanan did not have access to the EMR at home, but she said she was not aware of any agreement whereby Cooper could choose to voluntarily take supplements or tube feed if he chose not to take a supplement.

---

[4] Alt says that she did not discuss Cooper's plan of care or tube feedings with Kramer during her shifts on April 12 and 13, 2021.  Nothing in the record otherwise indicates whether Alt was one of the nursing staff with whom Kramer said she discussed Cooper's tube feeding with on April 12.

7

As a nurse, Alt is not in charge of determining whether an inmate must be force fed, and she must follow any order that is in place.  So Alt informed Nerison that there were no notes or changes in Cooper's medical file and that he would need to report for his tube feeding.

### C.  Relevant Video Footage

From this point, there is video footage from Nerison's body camera of Cooper's extraction from his cell, restraint, security escort to HSU, and tube feeding.  *See* Dkt. 54, exhs. 1003 and 1004.  The parties dispute how the video footage should be interpreted in several respects.  However, the court has viewed the video and finds that it clearly and unambiguously shows the events material to Cooper's claims.  As discussed below, the court will find as fact what is depicted in the video from the point Nerison approaches Cooper's cell to the arrival of the restraint chair.  *See Williams v. Norfolk S. Corp*., 919 F.3d 469, 471 (7th Cir. 2019) (*citing  Scott v. Harris*, 550 U.S. 372, 380 (2007)) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record [such as video evidence], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (courts do not credit party's version of events where the party's "story is 'blatantly contradicted' by the video such that no reasonable jury could believe it").  With one exception discussed further below, the parties' disputes regarding the video after that point are not relevant to Cooper's claims.

The video starts with Nerison (who is off camera) walking in to the housing unit to inform his staff and Cooper what Alt had told him:

### 1. Staff speak to Cooper at cell door[5]

Nerison approached Cooper's cell and said that Cooper "has got to go." Sergeant Phipps, who is waiting at Cooper's cell door, told Cooper that Alt said that "you still gotta go."

Cooper was unresponsive, so Phipps used a flashlight to get a visual on Cooper in his cell. Cooper then can be heard from inside the cell loudly stating, take "that flashlight off me, dumb bitch;" he also said "I don't need your help with the light" and called staff a "punk ass bitch."

After a period of quiet, Cooper began arguing with Phipps and the other staff, telling them that the security director said that he did not have to go for feedings in restraints. Phipps explained that the security director had told the officers that Cooper had to be in restraints. Betancourt then said that either way, it was still third shift, so everyone had to come out in restraints.[6] Cooper continued to argue with staff from inside his cell about being "disrespected" and placed in restraints. After some back and forth with the officers, he yelled "I'm not even talking to your bitch ass, shut the fuck up."

After again remaining quiet for about 30 seconds, Cooper acknowledged that he was ready to come out. Cooper went to the front of his cell and complied with being handcuffed while he had his hands through the trap in the cell door. After Phipps placed handcuffs on Cooper's wrists, the cell door opened and Cooper exited.

---

[5] This portion of the interaction appears on the video at 0:00:00 to about 0:04:18.

[6] The parties agree that it is standard procedure for any inmate who exits his cell on third shift (10:00 p.m. to 6:30 a.m.) to be placed in restraints. This procedure is for the safety and security of the inmate, staff, and institution because there is limited staff during third shift. Inmates who may otherwise be allowed to walk to HSU themselves without restraints during first or second shift are still required to be in restraints on third shift.

### 2.  Cooper restrained outside cell[7]

As soon as Cooper exited his cell, Phipps took hold of Cooper's left arm and stood behind Cooper.  Nguyen was in front of Cooper, and Betancourt was on Cooper's left side.  The parties do not dispute that even when an inmate is in restraints, it is important for more than one staff member to have their hands physically on the inmate's arms to ensure the inmate cannot break away and cause harm to themselves or others as they are being removed from the cell.

As Phipps and Nguyen attempted to grab Cooper by the arms and Betancourt was reaching her hands toward Cooper's hands to attempt to place a waist belt around Cooper, Cooper lifted his shoulders, clenched his fists, and started to move his elbows outward while stating "Man, don't start messin' around like this, man."[8]  Nerison began yelling "resisting," "stop resisting," and "I've got a taser."

The staff moved Cooper quickly to secure Cooper face-forward against the cell door, with his head turned to the left and his face pressed against the door:  Phipps placed his right shoulder into Cooper's back to secure him against the cell, and Nguyen secured Cooper from the left side.  Betancourt reached over Phipps, placed her hands firmly on the left side of Cooper's face and head, and held Cooper's head against the cell door with both of her hands.  Cooper says that "this is the exact time where Betancourt also began slamming Cooper's head against the wall several times as Cooper's head bounced off" and that "Betancourt took Cooper's head banged

---

[7] This interaction appears on the video from about 0:04:18 to 0:10:50.

[8] Cooper says that a male staff member had placed a pressure-point hold on his arm, causing him pain.  The video footage does not show any such hold, but Cooper says that staff concealed it.  This allegation is relevant only to the extent that it provides a possible explanation for Cooper's statement and subsequent elbow movements.  Cooper did not assert an Eighth Amendment excessive force claim with respect to the alleged pressure-point grab and cannot do so now.

and bounced it off of the wall using one hand with as much force as she could possibly use." Dkt. 80, resp. to ¶¶ 27-28.  However, the video does not show that any such force was used, and there are no sounds of banging or Cooper's head colliding with the metal door as Betancourt takes hold of Cooper's head and presses it against the door.  Cooper did not cry out in pain or protest, and he is not dazed.

Cooper was placed against the cell door within 10 seconds of exiting his cell.  He put up some limited resistance by moving and jerking his body in response to the officers' motions. When performing a "wall stabilization technique" like this, it is important to stabilize the inmate's head against the vertical surface to ensure that the inmate cannot: (1) use their head as a weapon to head butt staff; and (2) move their head from side to side to get a better visual of the staff around him, which makes it harder for the inmate to try and assault staff.[9]

After Cooper is secured against the cell wall, at 0:04:28, he is not visible on video for about 30 seconds because Nerison is standing directly behind the other officers.  During this time, Nerison drew his taser from the holster, removed the cartridge, activated the taser, and pressed the taser against Cooper's lower back.  He gave Cooper multiple loud, clear directives to stop resisting staff, informed Cooper that he had his taser, and stated that if Cooper continued to resist, he would deliver a drive stun to his back.[10]  Nerison asked Cooper a few times if he was going to comply, and Cooper asked what they were doing "all this for."  Cooper

---

[9] Cooper does not dispute the reason for this technique, but he says that it was uncalled for in his case because he was not resisting.

[10] Cooper does not deny that this happened, but he avers that he was not resisting staff.

does not allege that Betancourt banged his head during the period, and there are no banging sounds or protests on the video.

When the officers thought Cooper had relaxed, at 0:04:56, Nerison stepped back and told Cooper that they have to put a waist belt on him.  Betancourt released her hold on Cooper's head and secured his right arm, and Nguyen stabilized Cooper's left arm and leg.  No one had their hands on Cooper's head at this point.

At about 0:05:30, Betancourt realized she was in an uncomfortable position and suggested that she and Phipps switch places.  Phipps moved to take hold of Cooper's right arm while Nguyen held Cooper's left arm and Nerison placed his taser against Cooper's back. Betancourt then came around Phipps and reached up to place her hands on Cooper's head, the right side of which was freely resting against the cell door.  Cooper asked Betancourt why she was "smashing his face against the door," at 0:05:40, and Betancourt responds that this is what happens when you resist.  Cooper alleges that Betancourt again smashed his head against the metal door with her entire body weight at this point.  However, the video clearly shows that this did not happen; Betancourt is merely holding Cooper's head firmly in place to secure him.

Nerison called for a restraint chair to be brought to the housing unit so Cooper could be transported to his tube feeding.  The officers continued to hold Cooper calmly and securely against the cell door for five minutes, from 0:05:42 to 0:10:50, until the restraint chair arrived. During this entire time, Betancourt does not move her arms or Cooper's head.  Cooper made statements that he was not resisting but otherwise remained calm.  Another inmate can be heard talking about Cooper not resisting and the officers unnecessarily putting Cooper's face against the cell door.

### 3.  Cooper placed in restraint chair[11]

Sergeant Zeigler arrived on the unit with the restraint chair, which was left in the dayroom while Ziegler reported to Cooper's cell to assist with restraints.  Cooper was directed to kneel for leg restraints to be placed but Cooper refused, stating he was on a kneeling restriction.  Eventually, Cooper was placed in leg restraints while standing.  Staff brought Cooper to the dayroom where he was secured in the restraint chair and transported to the Restricted Housing Unit (RSH-1) HSU triage room.

## III.  Tube Feeding

When Nurse Alt arrived at RSH-1, she entered the HSU triage room.  Cooper made statements that he did not need to do the tube feeding because he had eaten the day before and had made an agreement with Kramer to eat and drink on his own without tube feeding.  Alt informed Cooper that there was nothing in his chart to say that he didn't need to be tube fed, and that she had talked to Buchanan, who said she had no knowledge of an agreement to not tube feed Cooper.

Because Cooper was insistent that he did not need the tube feeding, Nerison called Captain Bonfiglio and requested that he call Buchanan to get extra verification that the tube feeding needed to be completed.  Soon thereafter, Bonfiglio reported to Nerison that Buchanan said that the tube feeding needed to be done.  According to Buchanan, she did not have the

---

[11] This portion of the incident is depicted on video at 0:10:50-0:12:40.  However, it is unnecessary for the court to summarize it because Cooper does not base any of his claims on how he was treated when he was placed in the chair and transported to HSU.  For example, the parties dispute whether Cooper put up resistance and staff pinned him against the wall and yelled at him, but this dispute is not material to Cooper's excessive force claim against Betancourt or his related failure to intervene claim against Nerison.

authority to overrule an order placed by a provider, and an inmate's agreement with a provider is not an order.

Nerison told Alt about what Bonfiglio learned and returned to the HSU triage room to tell Cooper that Buchanan had verified the need to tube feed. The parties dispute what happens at around 0:49:55 to 0:50:02 of the video. Cooper says that Alt asked him if he would be willing to drink the Boost instead of being tube fed, but Nersion immediately said no that he would not allow that. However, a review of that portion of the video shows that Alt asks "so I assume we are doing the tube, you're not going to drink it," and Nerison responds "no," while Cooper remains silent.

Alt proceeded with the tube feeding of Cooper without incident or complaint.[12] It took about one minute to put the tube in his nose, and the feeding tube remained in Cooper's nose for about 15 minutes. While Cooper was in the RHU HSU, Alt examined Cooper's head and did not note any bruising, swelling, or sign of injury. Alt also assessed his vitals and quickly checked Cooper's pupils with her flashlight and found no overt indication of a concussion.

After the tube feeding was completed, Cooper was transported to a holding cell where he was strip searched according to policy, then returned to the RSH-1 HSU triage room to receive an evaluation by Nurse Howell. She noted Cooper's complaint of pain on the left side of his head and that he had slight soft tissue edema (slight swelling on his temple) but no break in the

---

[12] Cooper alleges that the tube feeding procedure caused him pain and a runny, bloody nose, which he believes to be permanent. Defendants say that Cooper's face makes no signs of distress and speaks calmly during the tube feeding. *See* Exh. 1003 at 0:55:42 to 1:12:30.

skin, redness, or hematoma.[13]  Howell ordered an ice bag per the nursing protocol.  Once the evaluation was completed, Cooper was returned to his segregation cell without further incident.

Later in the afternoon on April 13, 2021, Buchanan met with Cooper in HSU before he was brought to general population.  Her progress notes state that Cooper was alert and oriented and complained of a headache and small bump to the side of his head from an altercation that morning.  He was supplied with an ice bag for the bump to his head.  Cooper also reported that he was agreeable to drinking three containers of Boost twice a day in lieu of the tube feeding.  Buchanan reported this to Kramer, and she put in the order that day.  The order stated "Patient to come to HSU to drink 3 bottles Boost at 6 am & 6 pm."  Dkt. 56-1, at 11.

Also on April 13, 2021, Cooper was visited by Lieutenant Olson, who apologized for the day's events because Cooper should not have been visited at his cell door and forcefully tube fed.

## IV. Subsequent Tube Feeding Orders

On April 15, 2021, Cooper met with Kramer, at which time he agreed to go to HSU daily to drink two nutritional supplements in lieu of tube feeding.  This order was placed in the EMR the same day.  It stated "Patient to come to HSU to drink 2 bottles at a.m., noon, and p.m. med Pass in lieu of tube feeding."  Dkt. 56-1, at 10.

On May 4, 2021, Kramer sent the following email to the security director, Wayne Olson, and the associate medical director, Dr. Daniel La Voie:

---

[13] The parties dispute the extent and duration of Cooper's head injuries:  Cooper says that he suffered a severe head injury which caused headaches, neck pain, and a broken tooth for which he sought treatment with the HSU later into April and May of 2021.  Defendants point out that Cooper only submitted his health service requests and that there is no medical evidence that these injuries actually existed.

Please review tube feeding note dated 4/13/21 for patient Cooper 462946. This is the patient who was extracted from cell for TF after taking boost voluntarily the evening before. My directions to nursing the previous evening were that he could choose to drink the boost voluntarily and if not, then tube feed. The directive to feed consistently weather [*sic*] or not the patients were willing to drink seems to have come from HSM. At least on this occasion, nursing staff contacted HSM for clarification and were told to proceed with feeding.

Dkt. 66-1 at 61.

On May 5, 2021, Dr. LaVoie sent the following email response to Kramer, Olson, and

a few other DOC staff:

ALL: Please forward to the Warden as well. I do not think I could have been more clear on this point. Please recall that PIOC who eat intermittently are on a non-emergent hunger strike and are not to be force fed. In addition orders from ACPs are to be followed. No orders from nursing are valid. Nurses who write their own orders are practicing medicine without a license which is illegal in Wisconsin. I am disappointed that we are not implementing changes. I failed to express the last point specifically regarding orders. I think we need to meet weekly until changes are effected. Dan

*Id.* at 61-62.

Warden Larry Fuchs then told Olson via email to instruct HSU staff about what to do with

inmates who have a court order and drank boost within the past 72 hours.


## V.  Cooper's Conduct Report and Inmate Complaint

On April 13, 2021, Cooper complained about Betancourt's use of force to her supervisor,

Unit Manager Fink, who instructed Cooper to write an interview request form.  At the

medication pass on April 14, 2021, Cooper explained to Betancourt that her actions were

unnecessary and that he would be filing an inmate complaint.[14]  That same day, Betancourt wrote a conduct report #160790 for Cooper for disruptive conduct, disrespect, and disobeying orders related to the tube feeding the day before.  According to Nerison, he instructed Betancourt to write the report because conduct reports are usually written after a use of force incident due to the nature of the offense and the disruption to unit and institution operations it causes.

On April 16, 2021, Cooper wrote an inmate complaint stating that Betancourt had used excessive force against him on April 13, 2021.  The Institution Complaint Examiner's office received the complaint on April 19, 2021, and gave it file number CCI-2021-6082.  The complaint was dismissed and Cooper appealed.

At a later conduct report hearing, Cooper was found guilty of disruptive conduct, disrespect, and disobeying orders and was given 16 days of cell confinement.  Betancourt was not involved in the conduct report hearing or appeal.  Cooper appealed the hearing officer's decision to the warden, who reversed the hearing officer's decision because the security director did not review the conduct report within five working days, as required under Wis. Admin. Code § DOC 303.68(1).

Cooper and fellow inmate Maurice Collins aver that when Cooper asked to speak with Betancourt sometime in June 2021, she stood outside his cell and said "what the fuck do you want, do you want your ass beat again?"  When Cooper asked if she would apologize to him for banging his head and face against the wall in April, Betancourt responded, "you shouldn't have

---

[14] Cooper says that Betancourt responded with "if you think you're going to be filing a lawsuit or complaint, than I'll be filing a conduct report to put an end to that."  Betancourt denies saying anything besides telling Cooper that he had a right to file a complaint with the institution complaint examiner.

been mouthing off to me and my staff and you're lucky all I did was smash your head and face against the wall, the next time I'll break your fucking neck." Betancourt then walked away saying "try me, I fucking dare you."

## OPINION

Summary judgment is appropriate when there are no genuine dispute as to any material fact[15] and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" in order to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252).  At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party.  However, this is not true for inferences supported merely by speculation or conjecture.  *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019); *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).  Moreover, in cases like Cooper's, where video evidence is available, "to the extent [Cooper's] story is 'blatantly contradicted' by the video such that no reasonable jury could believe it, the Seventh Circuit will 'not credit his version of events.'" *Dockery*, 911 F.3d at 461 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Cooper asserts the following claims:  (1) an Eighth Amendment claim that defendant Betancourt used excessive force, from which defendant Nerison failed to protect him, while

---

[15] "Material facts" are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

18

restraining him on April 13, 2021; (2) a First Amendment claim that Betancourt retaliated against him when he threatened to file a complaint; and (3) Eighth Amendment deliberate indifference and Fourteenth Amendment due process claims that defendants Nerison, Buchanan, and Alt forced him to undergo tube feeding against his doctor's order and in disregard of his health and safety.  Defendants seek summary judgment on the grounds that Cooper did not suffer a compensable injury to justify his claims, defendants' conduct did not violate Cooper's constitutional rights, and defendants are entitled to qualified immunity.

## I.  Compensable Injury

Citing the Seventh Circuit's decision in *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020), defendants contend that Cooper's excessive force and medical care claims fail because he has not developed evidence of a recoverable injury.  *See also Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)) ("In order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages.'").  This court has held that "in the right circumstances, the lack of a serious injury can defeat a plaintiff's constitutional claim."  *Harris v. Karna*, No. 21-cv-133-jdp, 2022 WL 17039186, at *5 (W.D. Wis. Nov. 17, 2022) (citing *Outlaw v. Newkirk*, 259 F.3d 833, 840 (7th Cir. 2001) (minor injury "supports the conclusion that the incident was 'at most . . . a de minimis use of force not intended to cause pain or injury'"); *Lord*, 952 F.3d at 905 ("Lord's physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage," not sufficient to

demonstrate a cognizable harm)).  But here there is a genuine dispute of fact over precisely how badly Cooper was injured while he was being restrained and tube fed.

Defendants say that Cooper experienced nothing more than a minor bump on his temple from his restraint.  However, Cooper says that Betancourt's use of force on his head caused him to suffer a chipped tooth, neck pain, a severe headache, a swollen face, a black eye, and popping in his jaw that never seemed to set right after the incident.  He also says that forced tube feeding caused him severe pain, a "busted" nose, and a nonstop runny and bleeding nose.  Defendants argue that there is no objective evidence supporting Cooper's statements in the medical record or on the video.  They argue that the medical records show that the nurses who examined him after the tube feeding found only minor bruising on his forehead with no signs of a concussion and do not mention a bloody or running nose or any other long-term effects from the tube feeding.  Defendants also point out, correctly, that the video shows that Cooper made no signs of distress,[16] and Cooper is either quiet or calmly speaking during the tube feeding.

However, at summary judgment, medical records do not disprove a plaintiff's own account of visible injuries or his subjective account of pain.  It also is not possible to determine from the video alone whether Cooper was suffering from internal or non-visible injuries to his neck, head, and nasal passages, which resulted in subsequent pain.  In fact, Cooper complains during the feeding that the right side of his head is in a lot of pain.  Nurse Howell also noted Cooper's complaints of a headache soon after the incident and treated him with ice for swelling on his forehead, which suggests that she believed that he was injured to some degree.  Accordingly, the court cannot determine with any certainty that the nature and length of the

---

[16] The court agrees with Cooper that he squints when the tube is inserted in his nose.

injuries that Cooper describes are so minor as to entitle defendants to summary judgment based solely on an argument that their actions in restraining and tube feeding Cooper were *de minimis*.

## II. Excessive Force

### A. Betancourt

Cooper's excessive force claim against defendant Betancourt arises under the Eighth Amendment, which prohibits the use of excessive force on a prisoner. *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (internal quotation omitted). To prevail this claim, Cooper must prove that Betancourt applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). The factors relevant to this determination include: (1) why the force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether Betancourt perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321. Applying these factors, there is no evidence to support a reasonable finding by a trier of fact that Betancourt acted with malicious intent to harm Cooper.

The first and fourth factors are related. Although the parties dispute whether there was a need for Betancourt to hold Cooper's head in place against the cell door, the wall stabilization was reasonably necessary from Betancourt's and the other officers' perspective because Cooper had been argumentative while he was in his cell and he continued to argue with the officers and make jerking movements as soon as the officers placed their hands on him. It is undisputed that

the purpose of this restraint technique is to stabilize the inmate's head so that he cannot head butt staff, and to prevent the inmate from getting a better visual on the staff around him.

Although Cooper says that he was not resisting but only jerked his arms and elbows away from the officers because one of them was using a painful pressure hold, this is his subjective characterization of what he was doing and why. His movements, viewed objectively, allowed the reasonable inference that he was resisting the officers. In fact, Nerison, who was supervising from a few feet away, started yelling "resisting!" and "stop resisting!" as soon as Cooper made these movements. Moreover, Cooper alleges that the pressure point hold by one of the male officers was hidden from view. Therefore, a reasonable fact finder would not fault Betancourt for listening to Nerison and interpreting Cooper's movements as resistance and therefore a potential threat rather than a response to an unseen pressure point hold. Officers are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

As for the second factor, the video footage does not support a reasonable finding that Betancourt used a disproportionate degree of force relative to the need. Betancourt promptly placed Cooper in a hold by placing her two hands firmly on Cooper's head to keep it against the cell door. Cooper contends that Betancourt banged and bounced his head against the cell door at two points visible on camera, but the video clearly shows that this did not happen. Even if the hold caused Cooper pain, it was not intended to inflict pain.

In an attempt to show that Betancourt meant to cause him harm, Cooper points to Betancourt's alleged statements in June 2021, that he was lucky that all she had done was smash his head against the wall and would do worse if he mouthed off to her in the future. However,

22

even assuming, *arguendo*, that Betancourt actually made these statements, they do not establish that she acted inappropriately on April 13, 2021.  The video shows what actually happened; nothing in the recording supports Cooper's contention that Betancourt went further than necessary to ensure that Cooper's head was immobile.

With respect to the third factor, the parties dispute the extent of Cooper's injury, as discussed above.  But even crediting Cooper's report that he suffered pain, his ability to continue arguing and speaking while in the hold contradicts his characterization of its severity.  There are no visible marks on Cooper's head in the video.  The nurses who examined Cooper immediately after the tube feeding only noted minor swelling on his forehead.  Although Cooper subsequently submitted health service requests raising concerns about headaches, neck pain, and a chipped tooth, he offers no medical evidence that these injuries existed, that they resulted in treatment, or that they were causally related to Betancourt's involvement in the wall stabilization.  Given the substantial evidence contradicting Cooper's assertions of injury, this factor does not weigh significantly in Cooper's favor.

Finally, the fifth factor does not support a finding of excessive force.  The video footage shows a prompt, professional application of a wall stabilization after Nerison expressed concerns with Cooper's movements.  It shows no violent or overly aggressive movements by Betancourt, no banging sounds or painful outcries from Cooper.  It shows a release of the hold each time Cooper calmed down.  Further, Cooper has not submitted any evidence as to why this type of hold unreasonable or noncompliant.

For all of these reasons, no reasonable fact-finder could find that Betancourt violated Cooper's Eighth Amendment rights by briefly holding his head against his cell door during the

two wall stabilization holds.  Therefore, Betancourt is entitled to summary judgment on the merits of this claim.[17]


### B.  Nerison

A prisoner asserting a failure-to-intervene claim must prove:  (1) the officer had reason to know that excessive force was being used; and (2) the officers "had a realistic opportunity to intervene to prevent the harm from occurring."  *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (granting summary judgment on failure to intervene claim where the use of pepper spray was spontaneous and thus completed before bystander prison guards could prevent it); *see also Gill v. city of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).  Because Betancourt did not use excessive force against Cooper, it follows that Nerison is entitled to summary judgment on Cooper's failure-to-intervene claim against him.


### III.  Retaliation

To prevail on his First Amendment retaliation claim against defendant Betancourt, Cooper must show that:  (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter a person from engaging in the First Amendment activity in the future; and (3) facts make it plausible to infer that the First Amendment activity was a motivating factor in Betancourt's decision to take retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009).  If Cooper meets all three elements, then the burden shifts to

---

[17] Because I am dismissing Cooper's excessive force claim on the merits, it is not necessary to consider defendants' qualified immunity argument with respect to this claim.

Betancourt to show that she would have taken the same actions "even in the absence of protected conduct." *Greene v. Doruff*, 660 F.3d 975, 979 (7ᵗʰ Cir. 2011).

It is undisputed that Cooper did not file his inmate complaint against Betancourt until April 16, 2021, two days after Betancourt filed her conduct report against him. Therefore, Betancourt could not have filed the conduct report in retaliation for Cooper *filing* an inmate complaint. Cooper avers that he told Betancourt on April 14, 2021, that he would be filing an inmate complaint against her. *See* dkt. 68, at ¶ 69. However, as noted in this court's screening order, the Seventh Circuit has stated that "it seems implausible that a threat to file a grievance would itself constitute a First Amendment-protected grievance." *Bridges v. Gilbert*, 557 F.3d 541, 554 (7ᵗʰ Cir. 2009); *see also Maus v. Lesatz*, 2020 WL 1158572, at *6 (E.D. Wis. Mar. 10, 2020) (citing same). To date, the court of appeals has not specifically found that *threatening* to file a grievance is activity protected by the First Amendment. *See Brown v. Darnold*, 505 Fed. Appx. 584, 588 (7ᵗʰ Cir. 2009); *Jackson v. Dix*, 2018 WL 1370260 at *6 (E.D. Wis. Mar. 16, 2018).

Cooper attempts to surmount this legal hurdle by arguing that he actually began the complaint process on April 13, 2021, when he complained to Betancourt's supervisor, Fink. He points out that Wis. Admin. Code DOC § 310.07(1) requires that "[p]rior to filing a formal complaint, an inmate shall attempt an inmate to resolve the issue by following the designated process specific to the subject of the complaint." But "[w]hile it is well settled that *filing* an inmate complaint is protected activity, [Cooper] did not actually file an inmate complaint" about Betancourt's use of force until April 16, 2021. *Maus*, 2020 WL 1158572, at *6.

In any event, no jury could reasonably conclude that Cooper's initiation of the inmate complaint process with *Fink* is what motivated *Betancourt* to file the conduct report. Cooper has

presented no evidence apart from his own speculation that Fink told Betancourt anything about the Cooper's verbal complaint.   Moreover–and perhaps dispositive by themselves–are the undisputed facts establishing that Lieutenant Nerison directed Betancourt to file the report as part of CCI's standard procedure in all incidents involving force.

The only reasonable conclusion a jury could draw is that Betancourt filed the conduct report regardless and independently of Cooper's stated intent to file a complaint, because she was required to do so, and not because of Cooper's discussion with Fink or his threats to file an inmate complaint.  Because Cooper has presented no evidence from which a jury could conclude that his threat to file an inmate complaint was the reason why Betancourt filed the conduct report, Betancourt is entitled to summary judgment on the retaliation claim.[18]  *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.").

## IV.  Forced Tube Feeding

### A.  Legal Standards

Cooper is proceeding on claims related to the tube feeding under the Eighth and Fourteenth Amendments.  The elements of each claim are related:

The Eighth Amendment "protects prisoners from . . . grossly inadequate medical care."

---

[18] Because the retaliation claim can clearly be dismissed on the merits, it is not necessary to consider defendants' qualified immunity argument with respect to this claim.

26

*Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted).  To state a valid Eighth Amendment claim, Cooper must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Defendants argue that Cooper's alleged runny and bloody nose does not constitute a serious medical condition. Although that may be true, it is undisputed that Cooper was subject to court-ordered tube feeding for a hunger strike that Kramer had classified as intermittent as of April 12, 2021.  This is sufficient to establish  that he had a serious medical condition.  *See Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997) (medical need is serious if it is life-threatening, carries risk of permanent serious impairment, results in needless pain and suffering, or significantly affects daily activities).

"Deliberate indifference" under the Eighth Amendment encompasses two elements:  (1) awareness on the part of officials that the prisoner needs–or in this case, does *not* need–medical treatment; and (2) disregard of a substantial risk of serious harm to the prisoner by conscious failure to take reasonable measures.  *Petties*, 836 F.3d at 728.  To be liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer*, 511 U.S. at 837.  However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment.  *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Under the due process clause of the Fourteenth Amendment, a competent person has a liberty interest in refusing unwanted medical treatment. *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 262 (1990). This right extends to prisoners who may refuse forced medical treatment while incarcerated. *Knight v. Grossman*, 942 F.3d 336, 342 (7th Cir. 2019) (citing *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (discussing right to refuse unwanted administration of psychotropic medication)); *Davis v. Piller*, No. 14-cv-687-jdp, 2019 WL 367639, at *3 (W.D. Wis. Jan. 30, 2019). However, "at some point, a prisoner's refusal of medical treatment might turn suicidal and require the prison's intervention." *Keepers v. Tapio*, No. 20-cv-1306-bhl, 2020 WL 5877671, at *2 (E.D. Wis. Oct. 2, 2020) (citing *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005); *Sanville v. McCaughtry*, 266 F.3d 724, 729-34 (7th Cir. 2001)); *see also Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006) (at some point, a jail may have to force feed a prisoner to prevent the inmate from seriously endangering his or her health).

As with the Eighth Amendment, the Fourteenth Amendment requires a prisoner to prove that the defendant acted with deliberate indifference. However, the Fourteenth Amendment inquiry differs in that it focuses on whether the defendant was deliberately indifferent to the prisoner's right to refuse medical treatment. *Knight*, 942 F.3d at 343. "Neither negligence nor gross negligence is enough to support a substantive due process claim, which must be so egregious as to 'shock the conscience.'" *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998); *McDowell v. Vill. of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014)). The Seventh Circuit has held that a defendant is deliberately indifferent to an inmate's right to refuse treatment if he or she "subjectively knows" that the inmate did not consent to the treatment. *Id*. However, "[a] prisoner's right to refuse medical treatment cannot be infringed by a prison

28

regulation that is 'reasonably related to legitimate penological interests.'" *Id.* (internal citations omitted) (noting common example is when forced medication is needed to avoid spread of contagious disease or to quell disruptive behavior).

### B. Cooper's Arguments

The undisputed facts show that Cooper's hunger strike resulted in a court order for his tube feeding and a patient care order at Columbia for three packets of Boost via an NG tube twice daily. The physician order for an NG tube still existed at the time of Cooper's tube feeding on April 13, 2021. Nonetheless, Cooper alleges that by April 12, 2021: (1) Nurse Practitioner Kramer had classified his hunger strike as intermittent; (2) he had reached separate agreements with the security director and Kramer to eat and drink on his own in lieu of tube feeding; and (3) Nerison, Alt, and Buchanan were aware of these agreements. But, no such agreement or order was clearly entered in Cooper's medical record until *after* the April 13, 2021 tube feeding. And more importantly, it is undisputed that none of the defendants had the authority to change, override, or disregard the active order for tube feeding.[19]

Apart from his own declaration, Cooper relies on the following evidence to prove that Nerison, Alt, and Buchanan knew that Cooper had an agreement not to be tube fed if he ate or drank on his own:

1. A March 2, 2021 progress note from Dr. Ribault stating that Cooper was offered food at WSPF that he can eat voluntarily.

---

[19] This is especially true for Nerison, who is not a medical provider and had no role in administering treatment to Cooper. Cooper points to portion of the video where Nerison answers Alt's question about whether the tube feeding would continue. However, the only reasonable inference from the video is that Nerison was confirming what Captain Bonfiglio had learned from his call to Buchanan.

2. Alt's April 12, 2021 progress note referencing an unspecified agreement with the security director.

3. Kramer's April 12, 2021 progress note, classifying his hunger strike as intermittent based on his past eating and stating that he would be offered meal trays and fluids on a regular basis.

4. Kramer's May 4, 2021 email stating that she had instructed unnamed nursing staff on the evening of April 12, 2021, that Cooper could choose to drink Boost voluntarily, and if not, then be tube fed.

A reasonable jury could not conclude from this evidence, whether considered separately or collectively, that Nerison, Buchanan, or Alt were actually aware that Cooper was not supposed to be tube fed on April 13, 2021.  Here's why not:

First, Dr. Ribault's progress note predates the incident in question and was written while Cooper was housed at a different institution.  More importantly, the content of the progress note is not reflected in Dr. LaVoie's subsequent tube feeding order at Columbia.  *See* dkt. 56-1, at 5.  No reasonable care provider reading that note would know that Cooper was not supposed to be tube fed at Columbia on April 13, 2021.

Second, even though Alt's April 12, 2021 progress note refers to an "agreement" with the security director, there is no indication that any such agreement was translated into medical orders not to tube feed Cooper if he ate and drank on his own.  Moreover, Cooper avers in his declaration that the agreement was that the warden would release him from segregation if he ate and drank on his own.  Dkt. 68 at ¶¶ 15-21.  Even if Alt or Buchanan knew about such an agreement–and Cooper alleges that they did–they would not have known that it meant that Cooper was not supposed to be tube fed on April 13, 2021.  Quite the contrary:  it is undisputed that only a physician could have revised the order directing the frequency of tube feeding.  Neither the security director or warden could make such a change.

30

Third, Cooper correctly points out that Kramer's April 12, 2021 progress note classifies his hunger strike as intermittent based on his eating over the previous weekend. However, the note goes on to state that Cooper was "back on" his hunger strike as of the April 12 appointment. More importantly, Kramer did not clearly state in her progress note that Cooper could eat and drink on his own in lieu of any tube feeding. She also made no changes to Cooper's patient care order regarding tube feeding, as she later did after nursing staff apparently misunderstood her orders on April 13, 2021. But a reasonable jury could not conclude that a person reading the April 12, 2021 progress note and the patient care order on file would know not to tube feed Cooper on April 13, 2021.

Fourth, Kramer did write in a May 2021 email that she had instructed "nursing staff" on the evening of April 12, 2021, that Cooper could eat and drink on his own in lieu of tube feeding. However, the email does not say *whom* Kramer had instructed. Cooper says that Buchanan was present during his appointment with Kramer, but Buchanan does not recall being there. In any event, as discussed above, the resulting progress note and patient care orders do not document any such instruction from Kramer and Buchanan acted reasonably in following the order that existed in Cooper's file.

In sum, although the actions of Nerison, Alt, and especially Buchanan may have been misguided, there is no evidence to support an inference that these defendants intended to cause Cooper any harm. The purpose of the court-ordered tube feeding was to ensure that Cooper's life was not in danger. The accounts of Cooper's eating and drinking and possible agreements with the security director and his nurse practitioner were confusing and not clearly documented in his record. Kramer apparently told some unidentified nursing staff that she had intended for

31

Cooper to not be tube fed if he ate or drank on his own, but she failed to put that order in writing in any clear way. Therefore, the only reasonable inference to be drawn from the evidence is that Nerison, Alt, and Buchanan intended to act in Cooper's best interests by carrying out orders that were put in place to protect him and his health.

In addition, these defendants took Cooper's claims of seriously at the time and went to great lengths to confirm whether they were supposed to tube feed Cooper. Nerison and Alt twice stopped the tube feeding to investigate Cooper's claims that he did not need to be tube fed. Nerison called HSU and spoke with Alt, who checked Cooper's medical record and called her supervisor, Buchanan. And after Cooper arrived at the HSU triage room, Nerison had Captain Bonfiglio make another call to Buchanan verify that the tube feeding needed to be completed.

Accordingly, the only conclusion that a reasonable jury could reach is that defendants acted reasonably and appropriately under the circumstances and without deliberate indifference to Cooper's health, safety, or right to refuse medical treatment. This is not to say that this matter was handled well on an institution-wide level, but the staffers who actually were involved in the challenged tube-feeding did not violate Cooper's constitutional rights.


### C.  Qualified Immunity

Even if there were merit to Cooper's Eighth and Fourteenth Amendment claims, defendants are entitled to summary judgment under the doctrine of qualified immunity. Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted).  A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

To overcome defendants' invocation of qualified immunity, Cooper bears the burden of demonstrating that his rights were clearly established.  *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).  Cooper has not met his burden because he does not cite any authority—and I have not found any—clearly establishing that prison officials violate either the Eighth or Fourteenth Amendment by tube feeding an inmate when they do so in order to comply with an existing court order and an existing physician order, and when the inmate had eaten or drunk within 24 hours prior the tube feeding and he is reporting that he had reached on oral agreement with other staff members to be allowed to eat and drink on his own.  That's not surprising; what *would* be surprising would be clear law assessing liability against prison employees who, in the face of conflicting information and under time constraints, chose to follow the written orders of a judge and a doctor.

Accordingly, I will grant defendants' motion for summary judgment on Cooper's claims related to the tube feeding on April 13, 2021.

**V.  Cooper's Remaining Motions**

Because the court has dismissed all of Cooper's claims, this case will not go to trial. Therefore, Cooper's trial-related motion in limine and motion for subpoenas will be denied as moot.

Cooper also has filed a motion for sanctions in which he contends that there are several "false averments" and "intentional misrepresentations" in the declarations supporting defendants' motion for summary judgment.  Defendants assume, and Cooper does not deny, that Cooper is moving for sanctions under Federal Rule of Civil Procedure 11.  However, Cooper failed to comply with the safe harbor requirement in Rule 11(c)(2), which provides that a party cannot file a sanctions motion "if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service [of the motion] or within another time the court sets."

Even if Cooper had complied with the safe harbor requirement, the court would conclude that the motion for sanctions is unfounded.  For the most part, Cooper accuses the declarants of lying based on his own version of the events.  For example, Cooper claims that Betancourt's testimony that Cooper told her that he's "untouchable" and repeatedly called her a bitch is false. Although Cooper's averments to the contrary create a disputed issue of fact, his disagreement with Betancourt's testimony does not warrant sanctions.  Cooper also takes issue with how defendants and other declarants characterize certain evidence, and he attempts to show how several of their statements conflict with his interpretation of the video or medical record evidence.  It is common in civil litigation for disputes like these to arise, and they are not generally viewed as sanctionable.  The appropriate way for Cooper to flag his objections to

34

defendants' statements and characterizations of the evidence was in his in response to defendants' motion for summary judgment.  Cooper made the appropriate arguments in his response brief, which the court considered but rejected for the reasons discussed above.

For these reasons, the motion for sanctions will be denied.


ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, dkt. 51, is GRANTED.

2.  Plaintiff's motion for sanctions, Dkt. 64, is DENIED.

3.  Plaintiff's motion in limine, motion for writ of habeas corpus, and request for subpoena, Dkts. 91, 93, and 95, are DENIED as moot.

Entered this 28th day of September, 2023.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge